IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RHONDA KLEV,

Plaintiff, CIV S-11-0863 GGH

vs.

MICHAEL J. ASTRUE, Commissioner of Social Security,

Defendant. ORDER

_____________________________________/

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"). For the reasons that follow, Plaintiff's Motion for Summary Judgment is granted in part, the Commissioner's Motion for Summary Judgment is denied, and this matter is remanded to the ALJ for further findings as directed in this opinion. The Clerk is directed to enter judgment for plaintiff.

BACKGROUND

Plaintiff, born October 16, 1965, applied on April 11, 2006 for disability benefits. (Tr. at 176, 182.) In her application, plaintiff alleged she was unable to work since October 24,

2004, due to tendonitis, degenerative disc disease, fibromyalgia, carpal tunnel syndrome, "pre diabetis," and thyroid problems. (Id. at 176, 198.) In a decision dated December 10, 2009, ALJ Peter F. Belli determined that plaintiff was not disabled. (Id. at 10-21.) The ALJ made the following findings:[1]

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.
>
> 2. The claimant has not engaged in substantial gainful activity since October 24, 2004, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).
>
> 3. The claimant has the following severe impairments: fibromyalgia, carpal tunnel syndrome, degenerative disc disease, and tendonitis (20 CFR 404.1520(c) and

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
>
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
>
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
>
> Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.

416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant is limited to only occasional climbing of ladder/rope/scaffolds, stooping, crouching or crawling. Moreover, she should avoid frequent overhead reaching with her left arm.

6. The claimant is capable of performing past relevant work as a cashier and packing key maker. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from October 24, 2004 through the date last of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. at 12-21.)

ISSUES PRESENTED

Plaintiff has raised the following issues: A. Whether the ALJ Failed to Credit the Opinions of Plaintiff's Treating Physician and the Social Security Consultative Examiner Without Legitimate Reasons; B. Whether the ALJ Failed to Properly Evaluate and Credit Plaintiff's Testimony and Third Party Statements as to the Nature and Extent of Her Functional Limitations; and C. Whether the ALJ Failed to Credit the Testimony of the Vocational Expert in Response to Hypotheticals Which Accurately Reflected Plaintiff's Functional Limitations.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999).

Substantial evidence is more than a mere scintilla, but less than a preponderance. Connett v. Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

ANALYSIS

Treating Physician and the Social Security Consultative Examiner Opinions

Plaintiff contends that the ALJ failed to provide legitimate reasons for failing to credit the treating opinion of Dr. Verzosa or the Social Security consulting opinion of Dr. Selcon.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).[2] Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. An ALJ may reject an *uncontradicted* opinion of

---

[2] The regulations differentiate between opinions from "acceptable medical sources" and "other sources." See 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e). For example, licensed psychologists are considered "acceptable medical sources," and social workers are considered "other sources." Id. Medical opinions from "acceptable medical sources," have the same status when assessing weight. See 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d). No specific regulations exist for weighing opinions from "other sources." Opinions from "other sources" accordingly are given less weight than opinions from "acceptable medical sources."

a treating or examining medical professional only for *"clear and convincing"* reasons. Lester , 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for *"specific and legitimate"* reasons. Lester, 81 F.3d at 830. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict. Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)). The regulations require the ALJ to weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152 (9th Cir. 2001),[3] except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings. Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir.1999) (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751. The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional. Lester, 81 F.3d at 831.

> The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician. Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir.1990); Gallant v. Heckler, 753 F.2d 1450 (9th Cir.1984). As is the case with the opinion of a treating physician, the Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician. .... And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record.

Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). The opinion of a non-examining physician may constitute substantial evidence when it is "consistent with independent clinical findings or other evidence in the record." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002). Such independent reasons may include laboratory test results or contrary reports from examining

---

[3] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; (6) specialization. 20 C.F.R. § 404.1527

physicians, and plaintiff's testimony which conflicts with the treating physician's opinion. Lester, 81 F.3d at 831, citing Magallanes, 881 F.2d at 751-55.

In this case, the ALJ gave Drs. Verzosa and Selcon some weight but found that their functional limitation of two hours per day of standing and walking was not consistent with the objective findings. (Tr. at 20.) Instead, the ALJ gave significant weight to the non-examining opinion of Dr. Dann because this report was consistent with the clinical and laboratory findings. (Id.) This description is the sum total of the ALJ's reasoning.

Plaintiff contends that this reason is not legitimate. Plaintiff further contends that the ALJ gave no reason whatsoever to reject the remainder of these physicians' limitations, including Dr. Verzosa's opinion that plaintiff would need to lie down two to three hours per day.

At the time Dr. Verzosa completed his residual functional capacity assessment of plaintiff on April 21, 2008, he had been treating her on a monthly basis for seven and a half months. (Tr. at 634.) He diagnosed chronic low back pain based on disk herniation at L4-5, upper back pain, fibromyalgia, and left shoulder pain. This diagnosis was based on an MRI, physical exam, and x-ray. (Id.) Dr. Verzosa opined that plaintiff could stand and/or walk for two hours in an eight hour day and for only thirty minutes without interruption. She could sit for two hours in an eight hour day, but for only thirty minutes at a time, and would have to elevate her legs while sitting. This physician found that plaintiff could not sustain an eight hour day but could only work one to two hours per day. She would have difficulty with sustained posturing of the neck also. Based on this report, plaintiff could never bend, climb, balance, stoop, crouch, crawl, or kneel. (Id. at 635.) Plaintiff could only lift and carry 1-5 pounds constantly, and 6-10 pounds occasionally. Plaintiff could occasionally reach, handle, and finger with her right hand, but only rarely or never do so with her left hand. Plaintiff was restricted from working at heights, around moving machinery, with temperature extremes, fumes, humidity and vibration. Plaintiff would need to lie down two to three hours at a time, two to three times per day, and elevate her feet for two hours. (Id. at 636.) In support of these limitations, Dr. Verzosa noted evidence of

nerve root compression at L4-5 based on the MRI taken in June 2007, right sided leg pain and numbness going to the feet, limited movement, muscle weakness, sensory loss and tingling on the right side. Dr. Verzosa was unsure whether to expect deterioration or improvement in plaintiff's condition, but stated that she "still needs physical therapy, pain management to prevent deterioration." (Id. at 637.)

The MRI upon which Dr. Verzosa relied was dated June 6, 2007, and it found a slightly bulging disc at L1-2, L3-4, and bulging disc at L5-S1. There was disc dessication at L4-5 and minimally at L5-S1. There was "large, inferiorly migrating right paracentral extrusion at L4-5, producing significant canal stenosis and contacting at least the right L5 nerve root." At L5-S1, there was a very small left paracentral protrusion with annular disruption at L5-S1. (Id. at 569.)

It is not clear which x-ray Dr. Verzosa referenced in his report, but there are a few diagnostic studies in the record which pre-date his RFC evaluation. An x-ray of the left shoulder on May 16, 2006, was grossly negative, with no evidence of fracture, subluxation or significant degenerative change. The other finding was diminutive subacromial space, with "some degree of suggestion of a high riding humerus relative to the glenoid fossa." As a result, a rotator cuff tear could not be entirely excluded. (Id. at 421.) On August 4, 2006, diagnostic imaging of the lumbar spine was completed, showing early degenerative disk space changes at L4-5, but otherwise negative. (Id. at 428.) A CT scan, dated October 27, 2006, the day after Dr. Selcon's evaluation, noted that the lumbar spine had a prominent focal disk extrusion and disk bulging at L4-5, with the possibility of disk herniation in this area that needed to be further evaluated by MRI if clinically warranted. There was also a "relatively deep Schmorl node anterior aspect inferior endplate of L4 with reactive sclerosis possibly as a result of trauma." (Id. at 422-23.)

More recent diagnostic studies were taken after Dr. Verzosa's evaluation. On April 24, 2008, an MRI of the left shoulder showed a questionable tear at the base of the superior glenoid labrum, but it did not completely extend through the base. This MRI was negative in all

other respects, including no evidence of impingement, rotator cuff tear, fracture, subluxation or significant degenerative change. (Id. at 640.) A CT scan of the lumbar spine was done on May 11, 2009. It revealed a stable spine with no appreciable change since the prior study of October 27, 2006 in that it still showed a "Schmorl node deformity of the anterior /inferior aspect of L4 possibly secondary posttraumatic change." There were small disc bulges at L4-5 and L5-S1 with impingement of the thecal sac and marginal contact with nerve roots at L5-S1. (Id. at 724-25.) On August 5, 2009, an x-ray of the lumbar spine indicated degenerative disc disease at L4-5 and L5-S1. (Id. at 804.)

Dr. Selcon examined plaintiff on behalf of the Social Security Administration on October 26, 2006. He found that although plaintiff did not need surgery for her bilateral carpal tunnel syndrome, her bilateral grip strength was 60/65/70 and on the left side it was 55/60/60. (Id. at 416.) Plaintiff appeared to this consultant to be chronically ill and fatigued, and walked with a limp due to back pain; her gait was abnormal, but she did not use an assistive device. (Id. at 417, 418.) Exam of the back revealed paravertebral muscle spasm and tenderness. Straight leg raising and range of motion tests of the back and lower extremities could not be accomplished due to pain. (Id. at 417, 418.) Plaintiff was also unable to elevate both arms about her shoulders. (Id. at 417.) Range of motion of the elbows was normal, as was range of motion of the wrists. There was no tenderness to palpation in the wrists. There was no evidence of Heberden's nodes or Bouchard's nodes. Finger approximation was intact. Motor strength of the upper and lower extremities was normal. Plaintiff was diagnosed with chronic low back pain with exacerbation, fibromyalgia, tendinitis of both shoulders, and history of uveitis of the right eye with cataract surgery.

Dr. Selcon opined that plaintiff could sit for less than six hours in an eight hour day, stand/walk for less than two hours, and lift or carry ten pounds infrequently. Plaintiff could not climb, stoop, kneel, or crouch. She could not raise her arm above the shoulder. (Id. at 418.) At this visit, plaintiff reported she was working 32 hours per week as a cab driver. (Id. at 416.)

It should be noted that Dr. Selcon had for his review only a comprehensive evaluation done in connection with disability insurance, dated February 24, 2005, and report of a physical exam done by Dr. Brandt, dated March 2, 2006. He was not given any diagnostic studies for review. (Tr. at 416.)

Here, there were a few diagnostic studies which should have been at Dr. Selcon's disposal, including studies of the lumbar spine from August, 2006, and an x-ray of the left shoulder from May, 2006. These records were available at the time of Dr. Selcon's evaluation, but he apparently did not have access to them. There were many more studies taken after Dr. Selcon's evaluation and much more recently, however, including MRIs of the lumbar spine and shoulder in 2007 and 2008, respectively, and a CT scan and x-ray of the lumbar spine, in 2009. Even state agency Dr. Dann had better access to plaintiff's medical records than did this examining internist.

Dr. Dann, in contrast, did have access to the 2006 studies. However, he also conducted his non-examining evaluation prior to many of the later diagnostic studies cited above. The residual functional capacity assessment found that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for six hours in an eight hour day, sit for six hours, and was limited in pushing or pulling with the upper extremities. (Id. at 436.) Plaintiff could frequently climb ramps and stairs, balance, kneel, and occasionally climb ladders, ropes and scaffolds, occasionally stoop, crouch and crawl. Plaintiff was limited in reaching but not limited in handling, fingering, and feeling. (Id. at 437.) He gave little weight to Dr. Selcon's report because it was based on symptom "amplification and exaggerated findings." Based on plaintiff's reduced credibility, purely objective findings were given the most weight. (Id. at 436.)

The ALJ gave significant weight to Dr. Dann's report because it was "consistent with clinical and laboratory findings." (Id. at 20.) It was based on evidence independent from that considered by Dr. Selcon, but this report was approximately a year and a half older than Dr. Verzosa's report, which had the benefit of more diagnostic studies. Dr. Verzosa's RFC

evaluation, however, was completed on April 21, 2008, prior to several of the diagnostic studies as outlined above.

The reasons given by the ALJ to rely on a non-examining physician who did not have a year and a half of more recent independent evidence accessible to the treating physician who did have this access, were insufficient. Here, the ALJ relied on the opinion of one non-examining state agency physician, and gave less weight to the opinions of all examining physicians, including treating physician Dr. Verzosa and consultative examining physician Dr. Selcon. Although the ALJ is permitted to rely on the opinions of non-examining professionals, he may do so only where he gives specific and legitimate reasons that are supported by an "abundance of evidence." Id. Such evidence might include laboratory test results, contrary reports from examining physicians, plaintiff's testimony which conflicts with a treating physician, higher expertise of non-examining medical advisor, and suspect nature of examining physicians' test results. Id., *citing* Andrews, 53 F.3d at 1043. Further, in Magallanes, 881 F.3d at 753 (emphasis added), the court held that where the conflicting non-treating opinion is based on *independent* objective findings, it could constitute substantial evidence. More recently, the Ninth Circuit restricted the ALJ further by holding that the opinion of a non-treating physician, when based on the same evidence relied on by the treating physician, but supporting a different conclusion from the treating source, would not be considered substantial evidence. Orn v. Astrue, 495 F.3d 625 (9th Cir. 2007).

Here, the ALJ addressed each of the examining opinions which he declined to accept, stating only that they did not appear to be consistent with the objective findings, which utterly failed to meet the "specific and legitimate" standard, and then accepted the opinion of Dr. Dann, non-examining State Agency physician, who completed a check marked form in a report pre-dating Dr. Verzosa's report by a year and a half. See Murray v. Heckler, 722 F.2d 499, 501 (9th Cir.1983) (expressing preference for individualized medical opinions over check-off reports).

The undersigned is troubled by the ALJ's reliance on a non-examining physician's report which comes to a different conclusion than the treating physician, but is not based on any independent evidence, but rather only some of the same but older evidence. Indeed, the objective medical evidence as a whole indicates a serious condition with the back. It certainly does not stand as a basis on which to reject the treating and examining physician's assessments. Based on Lester, this opinion, without other evidence, was insufficient to reject the residual functional capacity portion of Dr. Verzosa's opinion. The ALJ's opinion does not pass muster under the specific and legitimate standards set forth above.[4]

Because so many objective medical records were created after the time that both Drs. Verzosa and Selcon issued their reports, the case must be remanded for further development by submission of *all* of the medical records to either Dr. Selcon or a different consultant.[5]

CONCLUSION

Accordingly, IT IS ORDERED that:

1. Plaintiff's Motion for Summary Judgment is GRANTED in part pursuant to Sentence Four of 42 U.S.C. § 405(g), the Commissioner's Cross Motion for Summary Judgment is DENIED, and this matter is remanded for further findings in accordance with this order. The Clerk is directed to enter Judgment for plaintiff.

\\\\\

\\\\\

\\\\\

\\\\\

---

[4] Defendant contends that the ALJ's thorough seven page discussion preceding his opinion discounting Drs. Verzosa and Selcon constitute specific and legitimate evidence. See tr. at 14-20. While the ALJ's summary of the evidence was thorough, it was merely that, a summary of the medical evidence. The court cannot guess which portion of the seven pages referenced by defendant were meant to provide the specific and legitimate reasons supporting the decision.

[5] The other issues raised by plaintiff will not be addressed due to the remand.

2. Given the satisfactory showing made in the Declaration of Bess M. Brewer (Doc. No. 17), the November 23, 2011 order to show cause why this case should not be dismissed for lack of prosecution is discharged.

DATED: August 23, 2012

/s/ Gregory G. Hollows
UNITED STATES MAGISTRATE JUDGE

GGH/076/Klev0863.ss.wpd